Good morning. Good morning. May it please the court. My name is Kyle Wackenheim from the Federal Public Defender's Office in the Western District of Oklahoma, and I represent Michael Morris. Mr. Morris challenges the District Court's denial of his motion to suppress on the basis that the search of his house without a warrant was unreasonable. We submit that the District Court's conclusion that this search for Mr. Morris and his house was justified by the consent and exigent circumstances exception was error, and we ask this court to reverse. I'd like to begin speaking on consent, but even before I get to that, Mr. Morris has to prevail, in my opinion, on both issues for this court to reverse. And the standard is substantially more difficult for consent given the review for clear error, but I think we can get there based on the facts of the record. I think that the primary complaint that Mr. Morris has on this appeal is the District Court's weighing of the circumstances, the totality of the circumstances. And to that end, there are a number of circumstances that I don't believe were given appropriate consideration. First, as a brief review, you may recall that the consent to search for Mr. Morris was given by his mother, who exited from the house. And this case is somewhat unique because we have body-worn camera footage of two officers, Officer Hobbs and Officer Peck. Officer Hobbs is the officer who interviews and eventually secures consent for Ms. Morris. Officer Peck, arguably, is more relevant for the exigent circumstances prong because his video recording spans a number of hours, from the very beginning all the way through. And I encourage the court, if it hasn't done so already, to review that videotape. We know that it was very important for the District Court below. I think the District Court stated that he was a big fan of these body-worn cameras. It was one of his first interactions with them, and he placed great weight. We also provided a transcript of the interaction, which notably the District Court said appeared a little more coercive than the actual footage. So I encourage the court to review that footage. But in addition to that footage and the two officers testifying, Ms. Morris herself testified. And specifically at page 106 of Volume 3, when asked if her consent was given voluntarily, she said, I was at that point exhausted. I was tired. I was hurt. I was groggy. I just wanted some place comfortable to sit. She stated that it was not of her own free will. That's a consideration that this court should take into account and that this court did not appropriately take. Well, how do we review the District Court's findings? For clear error. And when, if I look at you and say, well, you know, he looked really nervous staying in there, and Judge Briscoe looks at you and says, oh, he doesn't look nervous at all. If I'm the trial judge, does the Court of Appeals have to take my view from my vantage point? Isn't that the situation we have here? She testified, the policeman's cameras were shown, the verbatim testimony. Well, a couple things. First, how would you arrive at your conclusion that I appear nervous, though it's probably supported? What facts did you lay out and did you appropriately apply the totality of the circumstances test? And I say that the District Court below, and a clear review of the record shows that one of the primary arguments made by Mr. Morris was that his mother was threatened with jail. Right. By not consenting. Well, I mean, I've watched the video. She was threatened with jail if she was lying to the police about her son being in the house. That's very different than threatened with jail if you don't consent to us going in and searching for your son. And I think it's important not to overstate that because the video is pretty clear on that. A point I'd like to make about that. If she was lying and he was found inside the home, so presumably she was lying, she was not taken to jail. The only difference was that she did consent. So she consented. He was found in the home. Was she lying? I think from her perspective, she didn't know that he was in the home. And I know this small, chicoté, two-bedroom apartment. A giant apartment. Well, if you review Officer Peck's videotape and you see the entrance into the house, which I think occurs at around three hours into the videotape, you'll see a layout of the house. You'll see that through the front door is the main living room area with the recliner, which Miss Morris said that's where she was. And when they clear the house, you'll see Mr. Morris's bedroom, which is accessed through a back door. So it's plausible that she didn't know that her son was there. And certainly that's what she testified to. I think some of the other factors to be considered also support that her consent was not given voluntarily. The scene itself, a summer night, dark. Miss Morris roused from her sleep, which was induced by medication. She was drifting off watching her television program and is ordered out through the PA from Officer Peck into blaring police lights with multiple weapons pointed at her, including at least two AR-15s. And her condition, if you see in the videotape, it's very difficult for her to get out of the house. She's asking for a place to... She's visibly uncomfortable. And what's, I think, also important is that when her consent becomes... Her lack of consent is the most unequivocal when the tone changes. I think the district court highlights that. What does the officer do? He makes her walk somewhere else. And he knew at that point that she had arthritis, that she was hurting, that she just wanted to sit down and... I'm not saying it's mistreatment. Well, he immediately tried to help her to sit down. He wanted to have her sit in the car, but the door was locked and he didn't have the key. So it wasn't like he was trying to intentionally make her arthritis worse by making her stand. I don't know why he didn't get the key to open the door. She was not placed to sit down. The only point I'm trying to make is that when the consent becomes an issue, she's whisked away. And this is your view of the video. And as Judge Kelly points out, I might have a different view of the video. Judge Briscoe may have a different view. But what we have to find is that the district court's view of the video was clearly erroneous. How do we get there? I agree that's the standard. I agree that that's a difficult standard. I would submit that it's clearly erroneous because the district court didn't properly account for the threat of jail in its analysis. And I'd also say that in other contexts, though not in the totality of circumstances so far, that the failure to properly apply a legal standard does become an abuse of discretion. So that's one way to get there. And something else I'd like to note, a Supreme Court recently in a different context for probable cause for an arrest in the Wesby case, which is cited in our brief, discusses how totality of the circumstances is applied. It's not a divide and conquer approach. It requires the court to consider the whole picture. And I submit that the whole picture presented to the district court below requires the conclusion that her consent was not given voluntarily. But if the court disagrees and affirms on that, it doesn't need to get to the exigent circumstances question. But since that was a belt and suspenders approach to the order below, I feel that we do need to address it. For the exigent circumstances... How many hours passed between the time that the police arrived and they entered? Correct. How many hours was that? Well, it depends how you calculate the time from their arrival, which at the transcript at 6 is testified at 1.26 a.m. and they enter at 3 a.m. approximately. That's at 86 of the transcript. That's about an hour and a half. We submit that there's an additional amount of time that should be taken into account, and that is the amount of time from the report of the shooting, when the shooting took place, to the entrance of the officers. Now, both officers, I believe, testified that their impression was that the shooting had just occurred. However, the district court at page 117.3, when entering into a dialogue with counsel, says that in his mind, when officers arrived, their frame of mind was that a shooting had occurred within the last one and a half to two hours. So the point here is that when you're looking at what is the immediacy, what is the exigency here? First, we have two witnesses that wait at least an hour before reporting a shooting. That's unusual. Did the officers know that there was that time gap between the targets of the shooting and the report, the actual shooting and the report, by the people in the car? Well, on page 117, the district court seems to believe, and I submit that's a finding of fact, afforded some deference, that when they did arrive, although their testimony is somewhat contrary to that, we know that Officer Peck is told to get statements in anticipation of warrant, and then is later told we need statements in case something goes wrong in there. So he travels and he interviews these two people, gets their statements, observes the bullet fragment, the defect in the vehicle, and travels back. And when he arrives back, at that point, the team is aware. And the testimony in the record, defense counsel questioned repeatedly, what took so long? And the officers stated, we had to come up with a plan. I submit that the objective facts below don't support that they took one and a half or three hours to devise a plan for four people to get into a two-bedroom apartment. This is much different than some of the other cases. But isn't that the kind of thing you want officers to do before they go to a residence and knock on the door and rouse an elderly woman who's ill out of her sleep? I'd like them to get a warrant. But when they're planning to get in, what I submit is that it did not take that entire amount of time to devise a plan to go in. Of course, you want to be careful. You want to assure officer safety and the safety of the individuals inside. But what distinguishes the agency circumstances in this case, which we submit are absent, is that on all the other cases that are cited, there's something observed on scene. There's something to substantiate an immediacy. We need to get in that house and either see if there's any victims of reported shootings, or we see a person through the window, we see a 911 callback that's not being answered, we need to do something. When officers arrive at scene, the most that they see, apart from Ms. Morris coming out of the house, was a light getting turned off when they first arrived. There's nothing else. And I submit that exigency just simply isn't met. And I know the subjective belief of the officers is not relevant, but I think it informs what actions they were taking during the period of time in between arrival and entry into the house. With that, I'd like to reserve my time. Thank you. Okay. Please, the court, counsel. My name is Travis Smith. I'm an assistant U.S. attorney for the Western District of Oklahoma for the United States in this matter. As this court pointed out, again, the deference is to the district court findings in this matter to determine that the district court did not clearly err in determining that consent was free. I've always been curious in the world of video recordings of everything, we can see the video and what happened just as the district court can. Why do we have to defer to the district court? Can't we just look at this de novo? Your Honor, the precedent in this court is that in the Toledo case is that where there are two permissible findings of fact, the deference is to be given to the district court and more to the point of the facts of this case, the Santos case out of this court also indicates in that case, there was a video and this court indicated that there was to be deference given to the district court findings, which is essentially what we have in this matter. So if we have the district court finding that the officer hit Mrs. Morris over the head, and then we watched the video and no such thing occurred, then we're at clear error? Is that how we look at this then or what happens? It gets a little weird, doesn't it? Your Honor, I would agree that it does get a little weird. But again, as the law is, as it is now, we are to review it for clear error. We don't fortunately have those facts and circumstances in our case. And again, speculating to the extent there are clearly outside the realm of the record, which we do not have in this case, we may rise to the level of clear error. But in this case, fortunately, we have a number of factors as this court has pointed out that we look at engaging the free involuntariliness of the statement and the consent given that we can look to. Let me, since we're asking sort of questions that cross our mind, when you've got this length of time, why not just get a warrant? Your Honor, in the circumstances of this case, the police officers were in the middle of getting a warrant. The facts support that. And as the Cruz-Mendez case points out, it is not inappropriate to threaten a warrant when you have probable cause to get a warrant. And in this case, the evidence supports that they or the record indicates that Mrs. Morris did ultimately give consent, which is why they went in. I also, in kind of rising to the bait of the exigent circumstances argument, police were responding to, again, in looking at the realities of the situation, police were responding to a 911 call, which under the Nahar case indicates that there is kind of an inherent emergency. Well, but that would be true if they immediately acted on it. But instead, there's all of this background organizing, checking things, and creating a plan before they go to the home. That's correct, Your Honor. So the exigency is a little hard to support here, isn't it? Your Honor, I would concede that it is a little bit of a closer call. But again, as this Court pointed out in Nahar, the delay caused by a reasonable investigation into the situation facing the officers does not obviate the existence of an emergency. And the Court goes on also in Nahar to say, quote, the business of policemen and firemen is in italicies to act, not to speculate or meditate whether the report is correct. What is the emergency here? Your Honor, the record reflects that an individual fired a weapon off of a porch. And not only did the individual fire a weapon off of a porch, but into a passing car. And not only into a passing car, but into a passing car that was occupied by two individuals. By the time the officers ultimately go into the residence, they confirm that the vehicle had been struck. And Officer Peck also indicates at the transcript at page 84 that he knows that he is dealing with a convicted felon. So the emergency is that we to an individual who was standing on a porch and shooting off of his porch. Well, but he wasn't standing on the porch, shooting off his porch two hours later when they entered the home, right? That's correct, Your Honor. In fact, there was no noticeable activity from the home at all during that time when the house was surrounded. Your Honor, the record does not indicate that there was activity going on at the house. There was activity inside the house. But again, against the backdrop of the realities of the situation which we are to look at, those are the realities of the situation. Officers are responding to an incident where an individual is shooting off of a porch into a passing car. And again, as the Nahar case points out, it is the business of police to act. Right, but it's not the business of the police to act without a warrant unless it truly is an exigent circumstance. So you have to look at the immediacy versus would there be some imminent danger if you took the time to get a warrant? And there doesn't appear to be anything that would have prevented it here. So I guess maybe we should focus on your consent arguments. Yes, Your Honor. And again, the government would submit that the exigent circumstances are at play here and are satisfied. But again, it concedes that the consent argument would probably be the more sound way to affirm the district court. And there are a number of factors that govern this analysis, as this Court has pointed out. Defense counsel pointed out that Ms. Morris was somewhat medicated and was not somewhat all to her wits when dealing with this. But again, as this Court has indicated in the Sims case, the cases have never required perfect mental ability to find a consent to search was freely and voluntarily given. And again, the question is one when looking at the totality of the circumstances of mental awareness. And as the district court pointed out, Mr. Hobbs in dealing with Ms. Morris was noticeably courteous and he was very businesslike. The district court also pointed out that, quote, she was responsive, she was mentally alert, and she was reasonably articulate, as the transcript indicates. Again, by all outward appearances on the record, Ms. Morris consistently engaged with the officers. And as the district court pointed out, she knew how to say what she means. And the record reflects that in the videos. Defense counsel also pointed to- How many officers were on the scene that night? Your Honor, I believe the record is a little hazy on that. I believe there's some indication that there were up to seven officers on the scene. And they're all armed? And they were armed, Your Honor. But in dealing with Mrs. Morris individually, it appears there were not seven officers in totality dealing with her. But were those additional officers visible to her? I mean, in the video, we're pretty sure there were two people interact with her. But where are these other officers? They've surrounded the house? Your Honor, I believe the record is a little gray in that area. There is some indication in the record that officers were establishing a perimeter, that they were keeping eyes affixed to the house, which under the circumstances would be prudent. They have an individual who was shooting off of a porch. There's some indication also in the record, and I believe there were two officers engaged with Mrs. Morris, but there's also indication that I believe another officer was in the alley. In terms of the police presence of the vehicles, I believe there's evidence in the record that supports the one police cruiser was close to her, and then the others were staged somewhat in a distance away from the location where the individuals were speaking with, or the officers were speaking with Mrs. Morris. I believe there's testimony in the record that those did not have their lights on. So, again, defense counsel also points out that the officers intimated somewhat of a threat to Mrs. Morris in getting consent. Although there is some confliction in the testimony, Officer Hobbs testified at the transcript of page 51 that it was not a threat. But the district court nonetheless did give credence to this and said that the threat was ultimately in the mix, so to speak. He did make these communications, but as the court pointed out, these were conditioned on her lying, which is similar to what we have in the McNeil case to some extent. But in fairness, when she consented, there was no more talk about taking her in for lying, and she was obviously lying. That's correct, Your Honor. Officers did feel that she was lying. Yeah. So, I mean, yeah, you can say what I was really doing was threatening you because you're lying, but if you look at the practical effect of it, it was, I'm going to take you to jail if you don't consent. Your Honor, against the backdrop of the McNeil case, which the government would submit that the consent was nevertheless free and voluntarily given here, against the backdrop of the McNeil case, Mrs. Morris in this case was at her house. The defendant in the McNeil case was at a police station. So she was not at, she was at her own place. And again, similar to the circumstances of here, the court indicated that if she was lying, then they would take her to jail. Similarly, in the McNeil case, they were giving the defendant in that case options. If she was lying, that would be something that they would look to charge her with, which is similar to what the district court indicated in this case. The district court pointed out in the transcript at page 112 that the jail statement was conditioned on her lying and not on denying access, which is, I believe, an important point. But really, I mean, you've got two officers, you've got weapons showing, you've got perimeter with more officers, again, more guns, more cars, and there's reference to going to jail. I mean, just the reference of going to jail for any reason. Doesn't that intimidate her? I mean, you're in the middle of the night, you've just been aroused out of your sleep, and all of this chaos ensues. And she's got, I think, rheumatoid arthritis. I mean, she's got difficulties, she's got health issues. That's correct, Your Honor. And in looking at these instances in their isolation could be troubling, but again, we are guided by looking at the totality of the circumstances. And as this Court has pointed out. Well, that's the totality I'm talking about. I'm putting myself in her shoes. Would I feel intimidated? Or would my consent be voluntary? Your Honor, with regard to being intimidated, as this Court pointed out in the McNeil case, it is not per se coercion to present a suspect with correct information to make a reasonable decision. And again, against the backdrop of the McNeil case, Mrs. McNeil, the defendant in that case, was in a police station and was presented with similar statements in that if she was lying, again, it was conditioned on if she was lying, then she would go to jail. The Court upheld that that was voluntary consent. Again, in this case, the officers were within the Tenth Circuit precedent by indicating and giving her information so that she could make a correct decision and make a well-informed decision. So based on the record, Your Honor, the government would ask the Court to affirm if there are no further questions. Thank you. Thank you. I'd just like to make a couple of points first on the exigent circumstances. Government places great weight on the Najjar case. Smith, that case is drastically different. There was an immediate need. There's a victim laying in the floor. There's a 911 call. And there's just simply nothing observed at the scene and the difference in time. And the victim can be seen lying on the floor right through the window or something like that. I think that, or when opening the door. Hence the need to go in. And this Court should take a little more comfort in the ability to reverse on that court resolution given the standard review there. So there's no need to get there if the Court affirms on the first issue. But I don't think the Court should affirm on the first issue. It wasn't made part of the record, the exhibit of Ms. Morris's hands. But speaking to her rheumatoid arthritis, you can look at a footage of her hands at two hours, 53 minutes and 10 seconds into Officer Peck's video. Some of the other characteristics and factors, I think, should be taken into account that I didn't get an opportunity to mention. One, the number of times that consent is denied, or in the words of Officer Hobbs, deflected. It's clear that she is saying no in one way or another. And in her mind, perhaps she's covering for her son if you believe that she's lying to cover him.  One, she's very protective of her dog. That's clear. And two, she didn't think she had the ability to consent. And she's quickly, not strong-armed, but very firmly persuaded to abandon those two positions. One, we'll do our best not to shoot the dog. Although, if you were to look at 2558 of the Hobbs video, you hear one officer say to the And then secondly, whether or not she had the authority. And she's told, well, you've got the authority. And she's mocked between the officers for, oh, she tried this last time we tried to serve a warrant. I know it's difficult, given the standard of review. But I think under the totality of the circumstances and the factors that were not discussed in the district court's holding, that this court can reverse. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted. Court is adjourned.